Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone: (510) 601-1309
Email:  craigabrandt@att.net

Attorney for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>               Plaintiff,<br><br>     vs.<br><br>SUNPOL RESINS AND POLYMERS, a California corporation, DENIS HICKEY, an individual; and DOES 1-10, inclusive,<br><br>               Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

## INTRODUCTION

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.    On or about February 10, 2021, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the C.E.O. Denis Hickey of Defendant SUNPOL RESINS AND POLYMERS, by certified mail, at 2475 Croker Circle, Fairfield, California, ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.    A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

4.    More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior

administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.   The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7.   By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

8.   Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

9.   Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated

environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

10.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit (by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

11.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

12.     EDEN has members that reside, work and pursue recreational activities near the affected Receiving Waters. The Facility discharges storm water into a municipal storm drain system, which then discharges to the Wooden Valley Creek-Frontal Suisun Bay Estuaries, then into the Suisun Bay, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility. Eden members use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

13.     EDEN has standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced

1   such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to

2   Sue.

3   14.    Specifically, the individual member(s) who are experiencing harm from Defendants'

4   violations of the CWA are reluctant to utilize the Receiving Waters downstream from the

5   Facility as specified in Paragraph 12, above, due to the pollution caused by Defendants'

6   environmental violations that EDEN's members believe has entered into the Facility's Receiving

7   Waters; and the aesthetic and recreational interests of these members has been adversely

8   impacted.

9   15.    Defendants' ongoing violations of the California Industrial General Permit and the CWA

10  have and will continue to cause irreparable harm to EDEN and certain of its current members,

11  for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the

12  ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief

13  requested in this Complaint will not require the participation in this lawsuit of individual

14  members of EDEN.

15  16.    EDEN is informed and believes, and on such information and belief alleges, that

16  Defendants SUNPOL RESINS AND POLYMERS, located at 2475 Croker Circle, Fairfield,

17  California, was formed on or about July 20, 1989, as a California corporation.

18  17.    EDEN is informed and believes, and on such information and belief alleges, that,

19  Defendants SUNPOL RESINS AND POLYMERS, on or about May 20, 1992, submitted a

20  Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility. EDEN is

21  further informed and believes, and on such information and belief alleges, that on or about

22  January 27, 2015, Defendants SUNPOL RESINS AND POLYMERS, submitted an NOT to be

23  authorized to discharge storm water from the Facility under the California Industrial General

24

Permit ("General Permit") and was assigned Waste Discharger Identification number ("WDID") 2 481007012, according to the Regional Water Board's records.

18.    EDEN is informed and believes, and on such information and belief alleges that Defendant DENIS HICKEY is the Chief Executive Officer for the Facility according to the documents on file with the Secretary of State.

## STATUTORY BACKGROUND

19.    Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

20.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

21.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

23.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25.     The General Permit contains several prohibitions. Effluent Limitation Section V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

26.     Receiving Water Limitation Section VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

28.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X(B).

30.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I (1).

31.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X(H)(4), (5).

34.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

36.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

37.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI(B)(2)

38.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI(B)(4)

39.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI(A)

40.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

41.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI(B)(6)(c).

42.     The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

43.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

44.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

45.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII(A)

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII(C)

47.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit Section XII(D)

48.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

49.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of

compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See* also Clean Water Act section 309(c)(4)

### San Francisco Bay Regional Basin Plan

51.    The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

52.    The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

53.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

54.    Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

55.    The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

56.    The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

57.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

<u>Water Quality Impairment Area</u>

58.    The San Francisco Bay is listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

59.    In addition, the Suisun Bay, the Suisun Creek, the Suisun Marsh Wetlands, and the Suisun Slough, all which make up the Frontal Suisun Bay Estuaries, are listed for water quality impairment on the most recent Section 303(d) of the General Permit for the following: Dieldrin, Dioxin compounds (including 2,3,7,8-TCDD), Furan Compounds, Mercury, Selenium, PCBs (Polychlorinated biphenyls), PCBs (Polychlorinated biphenyls) (dioxin-like), Low Dissolved

Oxygen, Temperature, water, Salinity/TDS/Chlorides, Organic Enrichment/Low Dissolved Oxygen, Nutrients (Nitrate, Nitrite, total Nitrogen. Dissolved oxygen, temperature, and total phosphorus), and Diazinon.

<u>Citizen Suit Provision of the CWA</u>

60.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

61.    In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

62.    Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

63.     Defendant SUNPOL RESINS AND POLYMERS is an establishment that is primarily engaged in manufacturing synthetic resins and plastics materials. Important products of this industry include: cellulose plastics materials; phenolic and other tar acid resins; urea and melamine resins; vinyl resins; styrene resins; alkyd resins; acrylic resins; polyethylene resins; polypropylene resins; rosin modified resins; coumarone-indene and petroleum polymer resins; miscellaneous resins, including polyamide resins, silicones, polyisobutylene's, polyesters, polycarbonate resins, acetal resins, and fluor hydrocarbon resins; and casein plastics. Defendant SUNPOL RESINS AND POLYMERS is also an establishment that is primarily engaged in manufacturing fabricated plastics products or plastics film, sheet, rod, non-textile monofilaments and regenerated cellulose products, and vulcanized fiber whether from purchased resins or from resins produced in the same Facility.

64.     EDEN is informed and believes that the Facility falls within the standard industrial classification ("SIC") Codes 2821 – Plastic Materials, Synthetic Resins, and No vulcanizable Elastomers.

65.     The Facility discharges storm water pollutants into a municipal storm drain system of the City of Fairfield which then discharges to the Wooden Valley Creek-Frontal Suisun Bay Estuaries, then into the Suisun Bay, a tributary of the San Francisco Bay which is the "Receiving Waters" for Defendants.

66.     The Facility discharges storm water pollutants to Suisun Bay, the Suisun Creek, the Suisun Marsh Wetlands, and the Suisun Slough, all which make up the Frontal Suisun Bay Estuaries, and are listed for water quality impairment on the most recent Section 303(d) of the General Permit.

67.     EDEN is informed and believes that SUNPOL RESINS AND POLYMERS stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

68.     EDEN is informed and believes that based on its investigation, including a review of the Regional Water Board's records, aerial photography storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water that eventually discharges into the San Francisco Bay, a navigable Water of the United States.

69.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

70.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

                  Deficient SWPPP and Site Map

71.     On information and belief, Plaintiff alleges that since at least the beginning of the Facility's operations, Defendant SUNPOL RESINS AND POLYMERS has failed to develop an adequate SWPPP and a Site Map for the Facility.

72.     On information and belief, Plaintiff alleges that the Facility entered Level 1 Status on July 1, 2016.

73.     On information and belief, Plaintiff alleges that the Level 1 ERA Report prepared by the Facility's Qualified Industrial Storm Water Practitioner ("QISP") on March 2021, indicated a number of recommended BMP additions and modifications be made to update the Facility's SWPPP and to bring it into compliance with the General Permit.

74.     On information and belief, Plaintiff alleges that as of the that of this complaint, Sunpol Resins and Polymers has failed to upload an amended SWPPP pursuant to Sections X(B) and XII(C)(2)(a) of the General Permit.

75.     On information and belief, Plaintiff alleges that as of the date of this complaint, Sunpol Resins and Polymers has failed to upload an adequate revised SWPPP pursuant to the General Permit.

76.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Francisco Bay, including the pollutants of pH affected substances, Total Suspended Solids ("TSS") Oil & Grease ("O&G"), Nitrate + Nitrite Nitrogen (N+N), and Zinc.

Monitoring and Reporting

77.     On information and belief, EDEN alleges that Defendant SUNPOL RESINS AND POLYMERS does not have an adequate storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by the General Permit.

78.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

79.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Collect and Analyze Storm Water Samples</u>

80.    The Defendant SUNPOL RESINS AND POLYMERS is required to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples for the second half of the reporting year.

81.    On information and belief, Eden alleges that Defendant SUNPOL RESINS AND POLYMERS failed to collect and analyze the required number of storm water samples at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

82.    On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year.

83.    On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year.

84.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

85.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and one storm water samples from the second half of the reporting year.

86.     On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and one storm water samples from the second half of the reporting year.

87.     On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and one storm water samples from the second half of the reporting year.

88.     On information and belief, EDEN alleges that there were 12 total QSE's during the first half of the reporting years and 12 total QSE's during the second half of the reporting years from the year 2015 until the year 2021 that were required to be sampled and analyzed by the Facility.

89.     On information and belief, EDEN alleges that the Facility sampled 0 out of 12 QSE's for the first half of the reporting years from 2015 until 2021, and only 6 out of 12 QSE's for the second half of the reporting years from 2016 until 2021.

90.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

    Failure to Collect Storm Water Samples During Qualified Storm Events

91.     On information and belief, EDEN alleges that Defendants have taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that storm water samples be preceded by a period without a discharge.

92.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 1, 2016 was not made during a QSE, in violation of the General Permit, because there was no recorded rainfall on that date.

93.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on March 11, 2016 was made on the second consecutive day of rainfall, in violation of the General Permit.

94.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 4, 2017 was made on the third consecutive day of rainfall, in violation of the General Permit.

95.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on February 7, 2017 was made on the sixth consecutive day of rainfall, in violation of the General Permit.

96.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 17, 2019 was made on the third consecutive day of rainfall, in violation of the General Permit.

97.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on March 25, 2020 was not made during a QSE, in violation of the General Permit, because there was no recorded rainfall on that date.

98.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Sample Correctly for the Parameter of pH

99.     On information and belief, EDEN alleges that all of Defendant's laboratory reports showed evidence that the litmus test for pH were not conducted within the 15-minute holding time in violation of the General Permit.

100.     Information available to EDEN indicates that as a result of these practices, storm

water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Upload Storm Water Sample Analyses Within 30 Days

101.    On information and belief, EDEN alleges that Defendants failed to upload into SMARTS all storm water sampling and analytical results within 30 days for each sampling event.

102.    On information and belief, EDEN alleges that results from Defendant's storm water sample analysis collected on January 17, 2019 was 136 days late for uploading into SMARTS in violation of the General Permit.

103.    On information and belief, EDEN alleges that results from Defendant's storm water sample analysis collected on March 18, 2020 was 132 days late for uploading into SMARTS in violation of the General Permit.

Failure to Provide the Method Detection Limit From a "Non-Detect" Sample Result

104.    The Defendant SUNPOL RESINS AND POLYMERS is required to provide the method detection limit when analytical results from storm water sample is reported by the laboratory as a "non-detect" or less than the method of detection limit and is prohibited from reporting a value of zero.

105.    On information and belief, EDEN alleges that on February 8, 2017, Defendants reported values of zero or blank values for the parameters of Zinc (Zn) and pH, from laboratory results that reported analytical results as ND or "Non-Detect," in violation of the General Permit.

106.    On information and belief, EDEN alleges that on April 13, 2020, Defendants reported values of zero or blank values for the parameters of Oil & Grease (O&G), from laboratory results that reported analytical results as ND or "Non-Detect," in violation of the General Permit.

<u>Failure to Analyze Storm Water for the Correct Parameters - Impaired Water Body</u>

107.     The General Permit requires Facility to sample for additional applicable industrial parameters related to receiving waters listed under Section 303(d) of the General Permit, for impairments or approved Total Maximum Daily Loads ("TMDLs') based on the assessment under Section X.C.2.a.ix of the General Permit.

108.     On information and belief, EDEN alleges that Defendants discharge polluted storm water into the impaired water body known as Suisun Marsh Wetlands.

109.     On information and belief, EDEN alleges that the Defendant's Annual Report for the reporting year 2020-2021, states there are pollutants present at the Facility that may cause an exceedance of the Water Quality Standards for the Frontal Suisun Bay Estuaries.

110.     On information and belief, EDEN alleges that Defendants have failed to sample for all the Water Quality Standards for the Frontal Suisun Bay Estuaries as follows: Chloride, Dissolved Oxygen (Organic Enrichment/Low Dissolved Oxygen, Low Dissolved Oxygen), Nitrate, Nitrite, total Nitrogen. Dissolved oxygen, temperature, and total phosphorus, and Temperature.

111.     On information and belief, EDEN alleges Defendants have failed to test, for among other things, storm water discharges for Nitrate + Nitrite Nitrogen before it enters the impaired water body of Suisun Marsh Wetlands.

112.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

1

Falsification of Annual Reports

2  113.    EDEN is informed and believes that Defendants have submitted falsified Annual Reports

3  to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the

4  General Permit.

5  114.    Section XI.B of the General Permit provides that the Facility must collect and analyze

6  two storm water samples in the first half of each reporting year, and two samples in the second

7  half of each reporting year.  However, as discussed above, Defendants failed to collect and

8  analyze all the required storm water samples during the 2015-16, 2016-17, 2017-18, 2018-19,

9  2019-20 or the 2020-21 reporting years.

10  115.    On July 18, 2016 and July 12, 2017 Defendants submitted its Annual Reports for the

11  Fiscal Years 2015-16 and 2015-17. These reports were signed under penalty of law by Mr. Barry

12  Bromstead who was designated Legally Responsible Person ("LRP") for the Facility at the time.

13  116.    Mr. Bromstead responded "Yes" to Question No. 3 on both of the Annual Reports ("Did

14  you sample the required number of Qualifying Storm Events during the reporting year for all

15  discharge locations, in accordance with Section XI.B?")  However, as noted above, Defendants

16  failed to collect and analyze all the required storm water samples during either the 2015-16 or the

17  2016-17 reporting years.

18  117.     If a Facility does not collect four storm water samples during a particular reporting year,

19  the reporting requirements of the General Permit require the Facility to indicate "NO" to

20  Question NO. 3 on the Facility Annual Report and to provide an explanation for why the

21  required number of samples were not collected. The explanation as to why there were

22  insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

23

24

118.    On July 9, 2018, July 15, 2019 and July 24, 2020, Defendants submitted its Annual Reports for the Fiscal Years 2017-18, 2018-19 and 2019-20.

119.    The Annual Reports for Fiscal Years 2017-18 and 2018-19 were again signed under penalty of law by Mr. Barry Bromstead who was designated Legally Responsible Person ("LRP") for the Facility for those years. Mr. Barry Bromstead responded "No" to Question No. 3 on both of the Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?") Mr. Barry Bromstead certified that the required number of samples for each of the reporting periods was not collected because there were insufficient qualifying storm water discharges ("not enough rain") occurring during the reporting year and scheduled facility operating hours.

120.    Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years 2017-18 and 2018-19, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant to collect the requisite number of samples. Further, there were other Facilities near the Defendant's Facility that were able to collect the required number of storm water samples during the Reporting Years.

121.    The Annual Report for 2020-21 was signed under penalty of law by Mr. Scott Bromstead who was designated Legally Responsible Person ("LRP") for the Facility for that year. Mr. Scott Bromstead responded "No" to Question No. 3 on both of the Annual Report ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?") Mr. Scott Bromstead certified that the required number of samples for each of the reporting periods was not collected because there were

1  insufficient qualifying storm water discharges ("no rain") occurring during the reporting year and

2  scheduled facility operating hours.

3  122.    Records from the National Oceanic and Atmospheric Administration (NOAA)

4  website/database confirm that during the reporting years 20120-21, there were sufficient

5  Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start

6  of regular business hours to allow Defendant to collect the requisite number of samples. Further,

7  there were other Facilities near the Defendant's Facility that were able to collect the required

8  number of storm water samples during the Reporting Years.

9  123.    Based on the foregoing, it is clear that Defendant's LRPs intentionally made false

10  statements in the Facility's Annual Reports when they indicated that the Facility had collected

11  samples according to Section XI.B of the General Permit during the reporting years when in fact

12  the Facility did not collect the required number of samples. Further, Defendant's LRPs made

13  false statements when they claimed there were insufficient QSEs during the reporting years.

14          Failure to File Timely Annual Reports

15  124.    EDEN is informed and believes that Defendants have failed to comply with Section

16  XVI(A) of the General Permit, which provides that Dischargers shall certify and submit by way

17  of SMARTS an Annual Report no later than July 15th following each reporting year.

18  125.    The Annual Report shall include a Compliance Checklist that indicates whether the

19  Discharger has addressed all the General Permit requirements; an explanation for any non-

20  compliance with the General Permit requirements, and an identification of all revisions made to

21  the SWPPP within the reporting year.

22  126.    On information and belief, Eden alleges that Defendants Annual Reports for the reporting

23  years 2019-20 and 2020-21 were late in violation of the General Permit.

24

127.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Implement BAT/BCT and BMPs

128.    EDEN is informed and believes that Defendant SUNPOL RESINS AND POLYMERS has failed, since at least the beginning of the Facility's operations, to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit Sections I(C), V(A).

129.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Special Requirements For Plastic Materials

130.    On information and belief, EDEN alleges that Defendants have failed to comply with Section XVIII of the General Permit and California Water Code section 13367 since at least the beginning of the Facility's operations.

131.    On information and belief, EDEN alleges that Defendants manufactures, transports, stores or consumes plastic materials and that Defendants have failed to submit information to the State Water Board including the type and form of plastics found at the Site and which mandatory minimum BMPs are implemented at the Facility to prevent plastic material discharges.

132.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, plastic materials, are being discharged during rain events from the Facility to the San Francisco Bay.

<u>Discharges of Contaminated Storm Water</u>

133.     Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges in violation of the General Permit.

134.     Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.  These pollutants include oil & grease (O&G), total suspended solids (TSS), Zinc (Zn), and Nitrogen (Nitrates + Nitrites).

135.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Water Board. For the Reporting Year 2015-16 the TSS level at the Facility was measured at 180 mg/L which is 80 mg/L over the benchmark value and annual NAL for TSS. Defendants also measured levels of TSS in excess of the 100 mg/L in storm water discharges from the Facility for the Reporting Year 2018-19 at 110 mg/L which is 10 mg/L over the benchmark value and annual NAL for TSS.

136.     The levels of Zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for Zinc of .26 mg/L established by EPA and the State Water Board. For the Reporting Year 2019-20 the Zinc level at the facility was measured at .61mg/L which is .35 mg/L over the benchmark value and annual NAL for Zinc.

137.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, TSS and Zinc, are being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Submit Level 2 ERA Action Plan</u>

138.     The Facility entered Level 1 status for exceeding the EPA benchmark NAL for TSS which required the Facility to have a qualified QISP certify and submit via SMARTS a Level 2 ERA Action Plan that addresses the TSS exceedance on or before January 1, 2020. As of the date of this Complaint, Defendants have failed to submit a Level 2 Action Plan by uploading it into SMARTS system for TSS.

139.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Submit Level 2 ERA Technical Report</u>

140.     Pursuant to Section XII(D)(2) of the General Permit, on January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Facility with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP.

141.     The Facility entered into Level 2 Status on July 1, 2019, thus requiring the Facility to upload a Level 2 ERA Technical Report on January 1, 2021. As of the date of this Complaint, EDEN alleges Defendants have failed to submit a Level 2 ERA Technical Report by uploading it into the SMARTS system.

142.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Train Employees

143.    The General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

144.    Defendants failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

145.    On information and belief, Eden alleges that Defendant SUNPOL RESINS AND POLYMERS failed to appoint a Pollution Prevention Team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

146.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

147.    Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

1

**FIRST CAUSE OF ACTION**
**Failure to Develop a Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

2

3      148.      Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set

4      forth herein.

5      149.      The General Permit requires dischargers of storm water associated with industrial

6      activity to develop and implement a SWPPP.

7      150.      As outlined herein, Defendants have failed to develop and implement an adequate

8      SWPPP or Site Map for the Facility.

9      151.      Each day since at least the beginning of the Facility's operations, that Defendants

10     failed to develop an adequate SWPPP for the Facility is a separate and distinct violation of the

11     General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

12

**SECOND CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

13

14     152.      Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set

15     forth herein.

16     153.      The General Permit requires dischargers of storm water associated with industrial

17     activity to have developed and be implementing a monitoring and reporting program (including

18     sampling and analysis of discharges) that complies with the terms of the General Permit.

19     154.      As outlined herein, Defendants have failed to develop and implement a

20     monitoring and reporting program for its Facility.

21     155.      Defendant's ongoing failure to develop and implement a monitoring and reporting

22     program are evidenced by its failure to collect storm water samples pursuant to the requirements

23     of the General Permit.

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 31

156.       Each day since at least the beginning of the Facility's operations, that Defendants have failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

157.       Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

### THIRD CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

158.       Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

159.       The General Permit's SWPPP requirements and Effluent Limitation Section V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

160.       Defendants failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Total Suspended Solids ("TSS"), Nitrate + Nitrite Nitrogen (N+N), Zinc and other potentially un-monitored pollutants, in violation of Effluent Limitation Section V(A) of the General Permit.

161.       Each day since at least the beginning of the Facility's operations, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

162.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

163.     Discharge Prohibition Section III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

164.     Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendants have been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the General Permit.

165.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with the pollutants of pH affected substances, Total Suspended Solids ("TSS"), Nitrate + Nitrite Nitrogen (N+N), Zinc and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

166.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water

quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional

Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

167.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of

contaminated storm water are adversely affecting human health and the environment in violation

of Receiving Water Limitations of the General Permit.

168.     Every day since at least the beginning of Facility's operations, that Defendants

have discharged and continues to discharge polluted storm water from its Facility in violation of

the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

1311(a) against all Defendants.  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Failure to Properly Train Facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

169.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

170.     Section X.D.1 of the General Permit requires each Facility to establish a Pollution

Prevention Team who is then responsible for assisting with the implementation of the

requirements of the General Permit. The Facility is also required to identify alternate team

members to implement the SWPPP and conduct required monitoring when the regularly assigned

Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of

town business, or other absences).

171.     Section X.H.f of the General Permit also requires that each facility ensure that all

of its Pollution Prevention Team members implementing the various compliance activities of the

General Permit are properly trained in at least the following minimum requirements: BMP

implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

172.    Since at least the beginning of Facility's operations, Defendants have failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

## SIXTH CAUSE OF ACTION
**(Recovery Under the Catalyst Theory CCP §1021.5)**

173.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

174.    Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp.*, 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

175.    A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendants prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit "A" and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

176.    In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

177.    Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendants from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendants have developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6.    Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.    Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendants was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in

Plaintiff's Notice, provided that Defendants undertook any such corrective action after receiving

Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.


Dated:  September 13, 2021              Respectfully,


                                       By:  */s/ Craig A. Brandt*
                                            Craig A. Brandt
                                            Attorney for Plaintiff